1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

EASTERN DISTRICT OF CALIFORNIA

8

| | | |
|---|---|---|
| JOHN BELCHER, | ) | 1:09cv01234 DLB |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER REGARDING PLAINTIFF'S |
| | ) | SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

9
10
11
12
13
14
15
16

## BACKGROUND

17

Plaintiff John Belcher ("Plaintiff") seeks judicial review of a final decision of the

18

Commissioner of Social Security ("Commissioner") denying his application for supplemental

19

security income pursuant to Title XVI of the Social Security Act.  The matter is currently before

20

the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable

21

Dennis L. Beck, United States Magistrate Judge.

22

## FACTS AND PRIOR PROCEEDINGS[1]

23

Plaintiff filed his application on August 9, 2005, alleging disability since November 1,

24

1990, due to back and leg pain.  AR 107-110, 144-153.  After Plaintiff's application was denied

25

initially and on reconsideration, he requested a hearing before an Administrative Law Judge

26
27

_____

28

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

("ALJ").  AR 47-51, 53-57, 58.  On May 29, 2008, ALJ Michael J. Haubner held a hearing.  AR 325-362.  He denied benefits on July 24, 2008.  AR 18-28.  The Appeals Council denied review on May 15, 2009.  AR 3-6.

Hearing Testimony[2]

ALJ Haubner held a hearing on May 29, 2008, in Fresno, California.  Plaintiff appeared and testified without an attorney.  Vocational expert ("VE") Thomas Dachelet also appeared and testified.  AR 325.  At the beginning of the hearing, ALJ Haubner confirmed that Plaintiff received a notice in the mail explaining his right to representation.  Plaintiff indicated that he understood this right, and wished to give up that right and go forward without an attorney.  AR 327.

Plaintiff testified that he was born in 1950 and completed his third year of college.  AR 334.  He has not looked for work since 1990.  Plaintiff lives with his wife, who is on disability.  AR 336.  Plaintiff has a driver's license and drives an average of three times a week.  AR 326-327.  He is able to take care of his personal needs and feed his dog and cat.  AR 337-338.  He does not do dishes, take out the trash or make his bed.  AR 339.  Plaintiff goes shopping once a month and does laundry once a week.  AR 341, 343.  He visits with friends and family about twice a month.  AR 343.

During the day, Plaintiff watches television and reads.  He estimated that he spends about two hours a day reading and about six hours a day watching television.  AR 343.

Plaintiff testified that he is compliant with his treatment.  He confirmed that his diagnoses include a history of high blood pressure, diabetes, back surgery, obesity, status post gunshot would to the right foot, and low back pain.  AR 345.  Plaintiff was 5 feet, 10 inches tall and weighed 285 pounds.  His doctors have not told him to lose weight or exercise, though one doctor has told him to cut down on saturated fats.  AR 346. Plaintiff thought that he followed his diet about 65 percent of the time.  AR 346.

---

[2] The transcript is missing page 20 of the hearing (AR 344).  The parties have not cited this page and its omission therefore does not appear to impact the Court's ability to decide this action.

Plaintiff testified that he could not lift or carry any weight without hurting himself, but when asked how much he could lift and carry "without having to call an ambulance," he estimated that he could easily lift about 200 pounds. AR 347. He could lift 200 pounds for two hours out of an eight hour day. Plaintiff thought he could stand for about 10 minutes, sit for about an hour and walk for half a block. AR 348. He estimated that out of eight hours, he needs to lay down or elevate his feet for three hours. AR 349. Plaintiff thought that he could concentrate on something for 12 hours. AR 350.

Plaintiff explained that his lower back pain is constant. When he irritates it, which is about twice a week, he believed that the pain rated as a seven on a scale of one to ten. When his back is not irritated, he rated the pain as a three. AR 350. To relieve the pain, he changes positions frequently, lays down and takes hot baths. AR 351.

Plaintiff also has constant leg pain and believed that if his leg was not irritated, the pain rated as a two. About once a month, the pain in his leg reaches a nine. AR 351. He explained that at a nine, he is "on his knees vomiting," and that this has happened in supermarkets and parking lots. In the last three years, he has vomited from pain about four times. He has narcotic pain medication, but testified that if he takes as much as he needs to "make [himself] mobile," he is so intoxicated that he can't drive or function. Plaintiff explained that the pain in his back cannot be cured by surgery because if they try to remove the scar tissue, there's a 50/50 chance he could be paralyzed. If the scar tissue could be removed, it would grow back immediately. AR 352.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and background. This person could lift and carry 50 pounds occasionally, 25 pounds frequently, stand for about six hours out of eight and sit for about six hours out of eight. This person could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds. This person can occasionally stoop, kneel, crouch and crawl, and can frequently balance. The VE testified that this person could perform the entire range of sedentary and light jobs, as well as some medium jobs. As an example of medium work, the VE testified that

Plaintiff could perform the positions of hand packager, machine packager, and extractor operator. AR 354-356.

For the second hypothetical, the ALJ asked the VE to assume that this person could lift and carry 50 pounds occasionally, 25 pounds frequently, and could frequently bend, stoop and crouch. This person could frequently handle, feel, grasp, and finger. The VE testified that this person could perform the entire world of unskilled sedentary, light and medium work. The positions cited in the first hypothetical would also be available to this person. AR 356-357.

For the third hypothetical, the ALJ asked the VE to assume that this person could lift and carry 50 pounds occasionally, 25 pounds frequently, stand or walk about six hours a day and sit for about six hours a day. This person could perform the same positions. AR 357-358.

For the fourth hypothetical, the ALJ asked the VE to assume that this person could lift and carry up to 200 pounds, but could not do so for up to two hours out of eight. This person could stand for 10 minutes at a time, sit for one hour at a time and walk for a half block at a time. This person would need to elevate their feet for three hours out of eight. The VE testified that this person could not perform any work. AR 358.

Medical Record

On April 1, 2004, Plaintiff saw his treating physician, Nauman Qureshi, M.D., after receiving treatment elsewhere for one and half years. Plaintiff complained of back pain but was not taking any medications. His complete physical examination was unremarkable. Plaintiff was diagnosed with chronic back pain and high blood pressure. Dr. Qureshi prescribed a non-steroidal anti-inflammatory for his back pain and high blood pressure medication. AR 193.

On April 15, 2004, Dr. Qureshi's examination revealed high blood pressure, a weight of 297 pounds and a blood sugar level of 328. AR 192.

Plaintiff saw Dr. Qureshi on April 28, 2004. He forgot to bring his blood sugar records and was given extensive diet and exercise instructions for his diabetes, obesity and cholesterol. His examination was unchanged. AR 191.

On September 10, 2004, Dr. Qureshi strongly urged Plaintiff to check his blood sugar while fasting and to bring his records to every visit. His examination was unremarkable. He was

given diet and exercise instructions and diagnosed with diabetes, obesity and chronic back pain. Dr. Qureshi continued the anti-inflammatory medication and planned to observe his back issues. Plaintiff had lost 1.5 pounds since the last visit.  AR 190.

On September 26, 2004, Plaintiff was admitted to Tulare District Hospital with a gunshot wound to his right foot.  He was discharged the next day.  AR 246.

An MRI taken on September 27, 2004, revealed disc desiccation with disc space narrowing at L4-L5 and L5-S1.  At the L4-L5 level, there was right paracentral disc protrusion causing severe right foraminal stenosis with probable mass effect on the right L5 nerve root.  At the L5-S1 level, there was left paracentral disc protrusion causing severe left foraminal stenosis with probable mass effect on the left S1 nerve root.  AR 249.

Plaintiff returned to Dr. Qureshi on October 28, 2004.  Dr. Qureshi noted that he was not taking his medication as prescribed and "strongly emphasized" the need to be compliant.  His examination was unchanged and he was diagnosed with high blood pressure and diabetes. Plaintiff also forgot to bring his blood sugar records.  AR 188.

On December 9, 2004, Plaintiff complained of increasing back pain.  Dr. Qureshi reviewed his recent MRI.  His physical examination was unchanged.  Plaintiff was diagnosed with back pain, high blood pressure and diabetes.  He was given Vicodin for pain and referred to a neurosurgeon.  Plaintiff again forgot to bring his blood sugar records to the examination and was urged to bring them in the future.  AR 187.

Plaintiff returned to Dr. Qureshi on January 7, 2005, for results of his blood tests.  His examination was unchanged.  He was diagnosed with diabetes and his medication was increased. AR 186.

At his June 2006 follow-up, Plaintiff's blood sugar and blood pressure were high.  The rest of the examination was unchanged.  Plaintiff had run out of his medications.  He was given diet and exercise instructions and strongly urged to check his blood sugars and to bring the records to every appointment.  He was also strongly urged to be compliant.  AR 185.

Plaintiff returned to Dr. Qureshi for follow-up on July 15, 2005.  His examination was unchanged and unremarkable except for his blood pressure, which was 140/90.  Plaintiff's high

blood pressure medication was changed and he was given diet and exercise instructions. He was also prescribed a different non-steroidal anti-inflammatory for his back. Plaintiff complained of one of his fingers getting numb and he was referred to a neurologist for an expert opinion. AR 184.

Plaintiff saw Dr. Qureshi on December 23, 2005. Plaintiff's blood tests revealed elevated LDL cholesterol, blood sugar and white blood cells. His examination was unremarkable. Plaintiff was diagnosed with obesity, an elevated white blood cell count, high blood pressure, diabetes and hyperlipidemia. He was also diagnosed with anxiety and depression. Plaintiff was not suicidal and Dr. Qureshi planned to observe him. Plaintiff was given diet and exercise instructions. He was started on medication for high blood pressure and told to keep a "very close eye" on his blood pressure. He was also started on medication for his diabetes and hyperlipidemia. Plaintiff was also strongly urged to follow-up with the foot doctor, eye doctor, dentist and diabetic educator on a regular basis. AR 182.

Plaintiff returned to Dr. Qureshi on June 20, 2006, after a sixth month lapse. He was not checking his blood sugars, continued to complain of back pain and was only taking baby aspirin. His examination remained unchanged and he was diagnosed with chronic lower back pain, high blood pressure, obesity and diabetes. He received diet and exercise instructions and was started on medication for his high blood pressure. Plaintiff was also given pain medication for his back. Plaintiff received a glucometer and was instructed to check his blood sugar at least twice a week while fasting and to bring the records with him to every visit. AR 181.

Plaintiff saw Dr. Qureshi again on June 27, 2006. His examination was unchanged and unremarkable. He was given diet and exercise instructions and diagnosed with obesity, high blood pressure, diabetes, hyperlipidemia and back pain. Plaintiff was urged to check his blood sugars regularly and while fasting. Plaintiff was started on Lipitor and was given samples of Ultram for his back pain. Dr. Qureshi wrote prescription for Darvocet for use if the Ultram did not help. AR 180.

On August 24, 2006, State Agency physician Lyle N. Yates, M.D., completed a Physical Residual Functional Capacity Assessment form. Dr. Yates opined that Plaintiff could

occasionally lift and carry 50 pounds, 25 pounds occasionally, stand and/or walk for six hours and sit for six hours.  He could occasionally climb ramps and stairs and could never climb ladders, ropes or scaffolds.  Plaintiff could frequently balance and could occasionally stoop, kneel, crouch and crawl.  AR 270-277.

Plaintiff returned to Dr. Qureshi for follow-up on September 12, 2006.  His examination was unchanged.  Plaintiff reported that the Ultram was "somewhat effective" and Dr. Qureshi increased the dose.  AR 179.

On September 26, 2006, Plaintiff returned to Dr. Qureshi.  His examination was unchanged.  He was given diet and exercise instructions and was diagnosed with obesity, high blood pressure, chronic back pain and diabetes.  Dr. Qureshi continued the current regime for management of Plaintiff's back pain.  Plaintiff forgot to bring his blood sugar records to the appointment.  AR 178.

Plaintiff returned to Dr. Qureshi on October 25, 2006.  His blood pressure was elevated but his physical examination was otherwise unchanged.  Dr. Qureshi diagnosed morbid obesity, allergic rhinitis and sinusitis, high blood pressure and diabetes.  Dr. Qureshi gave Plaintiff diet and exercise instructions and stressed the importance of bringing his blood sugar records to the appointment.  He was again "strongly urged" to follow-up with an eye doctor, foot doctor, dentist and diabetes educator on a regular basis.  AR 177.

Plaintiff saw Dr. Qureshi on December 11, 2006.  He was diagnosed with morbid obesity, high blood pressure, diabetes, hyperlipidemia and chronic back pain.  His examination was unchanged.  Dr. Qureshi gave Plaintiff "extensive" diet and exercise instructions and told him that he must check his blood sugars and blood pressure on a regular basis.  He was instructed to continue Ultram.  AR 176.

On March 12, 2007, Dr. Qureshi noted that Plaintiff was not compliant with his medications and diabetes regimen.  His examination was unchanged and he was again given diet and exercise instructions.  Plaintiff forgot to bring his blood sugar record and was checking his blood sugar very infrequently.  Plaintiff was to continue Ultram for pain.  AR 175.

On April 14, 2007, Plaintiff saw Sarupinder Bhangoo, M.D., for a consultive examination. Plaintiff complained of a long history of back pain. He reported that he is able to care for his personal needs and do some cooking and cleaning, but that he mostly stayed home and watched television. On examination, Plaintiff was a fairly large sized male who came into the examination room without any difficulty and moved around well. Plaintiff did not seem to be in pain and was able to get on and off the examination table without problems. Plaintiff's gait was normal and he could do tip-toe and heel walking. Straight leg testing was negative, with no paravertebral muscle spasms, tenderness, crepitus, or effusions. Motor strength was 5/5 with good muscle tone and bulk, and grip strength was normal. Plaintiff's sensory examination was normal. AR 169-172.

Dr. Bhangoo opined that Plaintiff should be able to stand and/or walk for at least six hours, sit for eight hours, and lift and carry at least 50 pounds occasionally and 25 pounds frequently. He could frequently bend, stoop and crouch and could frequently reach, handle, feel, grasp and finger. Based on his examination and evidence of previous back problems with no specific musculoskeletal or neurological deficits, Dr. Bhangoo believed that Plaintiff could perform at least medium work. AR 172-173.

On May 4, 2007, State Agency physician J. V. Glaser, M.D., completed a Physical Residual Functional Capacity Assessment form. He opined that Plaintiff could occasionally lift and carry 50 pounds, 25 pounds occasionally, stand and/or walk for six hours and sit for six hours. He had no further limitations. AR 160-164.

ALJ's Findings

The ALJ first explained that in a prior hearing decision dated November 18, 2003, Plaintiff was found to retain the residual functional capacity ("RFC") to perform medium work. The presumption of continuing non-disability applied to the unadjudicated period after November 18, 2003. AR 21.

As to the current application, the ALJ found that Plaintiff had the severe impairments of obesity, hypertension, diabetes mellitus, status post back surgery, status post gunshot wound with history of right foot fracture and lumbar disc protrusions with lumbar scar tissue and low back

pain.  Despite these impairments, the ALJ determined that Plaintiff retained the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently, sit, stand and walk for six hours in an eight hour day, and frequently bend, stoop, crouch, reach, handle, feel, grasp and finger.  With this RFC, Plaintiff could perform a significant number of jobs in the national economy.  AR 23-27.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an impairment or a combination of impairments that is considered "severe" (obesity, hypertension, diabetes mellitus, status post back surgery, status post gunshot wound with history of right foot fracture and lumbar disc protrusions with lumbar scar tissue and low back pain) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) has no past relevant work; but (5) can perform a significant number of jobs in the national economy.  AR 23-27.

Here, Plaintiff argues that the ALJ (1) erroneously applied *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988); (2) failed to comply with SSR 00-4p; (3) failed to properly evaluate his obesity; (4) failed to comply with SSR 96-6p; (5) improperly rejected his allegations: (6) failed to ensure that he knowingly waived his right to counsel; and (7) failed to fully develop the record.

**DISCUSSION**

A.    ALJ's Application of *Chavez v. Bowen*

Plaintiff argues that the ALJ erroneously applied *Chavez v. Bowen* in finding that the presumption of continuing non-disability applied to the period subsequent to his prior application.

The principles of res judicata apply to administrative proceedings. *Lyle v. Sec. Health & Human Serv.*, 700 F.2d 566, 568, n. 2 (9th Cir. 1983).  A previous finding that a claimant is not disabled creates a presumption of continuing nondisability. *Miller v. Heckler*, 770 F.2d 845, 848 (9th Cir. 1985).  An ALJ's finding of nondisability creates "a presumption that [the claimant] continued to be able to work after that date." *Id.*  To overcome this presumption, the claimant

must prove "changed circumstances" indicating a greater disability. *Chavez v. Bowen*, 844 F.3d 691, 693 (9th Cir. 1988); Acquiescence Ruling ("Ruling") 97-4(9).  For example, a change in age status after the first determination is a changed circumstance sufficient to rebut the presumption of continuing nondisability. *Chavez*, 844 F.3d at 693.  Changed circumstances also include an increase in the severity of the claimant's impairment, the alleged existence of a new impairment, or a change in the criteria for determining disability.  Ruling 97-4(9).

However, even where the claimant is able to overcome the presumption of disability, certain prior findings are entitled to some res judicata consideration.  Prior determinations of RFC, education and work experience are entitled to res judicata absent new and material evidence on the issue. *Chavez*, 844 F.2d at 694.  "Adjudicators must adopt such a finding from the final decision on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding."  Ruling 97-4(9).

Here, the ALJ explained that Plaintiff had filed a prior application, which was denied by a hearing decision dated November 18, 2003.  The ALJ would apply the presumption of continuing non-disability "unless claimant rebuts the presumption by showing a 'changed circumstance,' such as, for example, an increase in the severity of the claimant's impairment."  He concluded,

> Here, the unadjudicated period is from November 19, 2003, to the present.  The claimant has not presented any new or material evidence warranting a change in his residual functional capacity.  Therefore the presumption of continuing non-disability applies.

AR 21.

Plaintiff contends that certain changed circumstances existed to prevent the ALJ from applying the presumption of continuing non-disability.  Plaintiff is correct.  For example, Plaintiff alleged additional impairments and had attained a new age category.  It appears that the ALJ correctly noted that new and material evidence *could* warrant a change in the RFC.  This does not mean, however, that the presumption of continuing non-disability automatically applies.  As discussed above, the ALJ must first examine whether changed circumstances exist to prevent

11

a finding of continuing non-disability.  If changed circumstances exist, as they do here, the prior

RFC is still entitled to res judicata.  The ALJ must then determine whether new and material

evidence exists to warrant a change in the prior RFC.

However, the ALJ's failure to cite to Plaintiff's changed circumstances and his slight

misapplication of the *Chavez* standard is harmless error.  *Batson v. Comm'r Soc. Sec.*, 359 F.3d

1190, 1197 (9th Cir. 2004) (finding an error harmless where it did not negate the validity of the

ALJ's ultimate conclusion).  A review of the ALJ's decision reveals that he thoroughly reviewed

the medical evidence in finding new severe impairments and imposing additional limitations.  In

other words, the decision demonstrates that the ALJ did not strictly apply *Chavez* because he

continued on with his review.  Even if he correctly found that Plaintiff's changed circumstances

rebutted the presumption of continuing non-disability, the ALJ would have had to go forward and

review the medical evidence, as he did despite his error.

Accordingly, the ALJ's error was harmless.

B.    Compliance with SSR 00-4p

Plaintiff next argues that the ALJ failed to comply with SSR 00-4p and therefore erred in

relying on the VE's testimony.

SSR 00-4p states that generally, occupational evidence provided by a VE should be

consistent with the occupational information supplied by the Dictionary of Occupational Titles

("DOT").  Where there is an apparent conflict, the ALJ must elicit a reasonable explanation for

the conflict before relying on the VE to support a determination or decision about whether the

claimant is disabled.  *See* SSR 00-4p.  The ALJ may rely on the testimony of a VE over that of

the DOT by determining that the explanation given by the VE is reasonable and provides a basis

for doing so.  *Id.*

Although evidence provided by a VE "generally should be consistent" with the DOT,

"[n]either the [Dictionary of Occupational Titles] nor the [vocational expert] ... evidence

automatically 'trumps' when there is a conflict."  *Massachi v. Astrue,* 486 F.3d 1149, 1153 (9th

Cir. 2007) (citing SSR 00-4p).  Thus, the ALJ must first determine whether a conflict exists.  If it

does, the ALJ must then determine whether the VE's explanation for the conflict is reasonable

1   and whether a basis exists for relying on the VE rather than the DOT.  _Id._  Where the ALJ fails to

2   ask the VE if the positions are consistent with the DOT, the Court is unable to determine whether

3   substantial evidence supports the ALJ's finding at step five.  _Id._

4        The ALJ found that Plaintiff retained the RFC to lift and carry 50 pounds occasionally, 25

5   pounds frequently, to sit, stand and walk for six hours in an eight hour day, and to frequently

6   bend, stoop, crouch, reach, handle, feel, grasp and finger.  AR 24.  With this RFC, the VE

7   testified that such a person could perform all unskilled sedentary and light positions, as well as

8   some medium unskilled work.  AR 355, 357.  As examples of medium work, the VE identified

9   the positions of (1) Census Code 964, identified in the DOT as hand packager; (2) Census Code

10  880, identified as machine packager; and (3) Census Code 896, identified as extractor.  The VE

11  testified that there were 16,014 hand packager positions in California, 1,941 machine packager

12  positions in California, and 16,122 extractor positions in California.  AR 355-357.

13       Plaintiff first contends that the DOT classifies the hand packager and machine packer as

14  requiring greater capacities than the ALJ found.  Specifically, the hand packager position requires

15  "constant" reaching, handling and fingering, and the machine packager position requires

16  "constant" handling.  He also argues that the Census Code numbers reflect jobs at all skill and

17  exertional levels.  According to Plaintiff, because the VE failed to identify the positions by DOT

18  code and used "grouped occupations," his testimony is not substantial evidence.

19       As Defendant notes, 20 C.F.R. § 416.966(d)(3) provides that the Administration can take

20  administrative notice of job data from numerous sources, including Census Reports.  This does

21  not, however, relieve the ALJ of the requirement to ensure consistency with the DOT.  Although

22  the ALJ states that the VE's testimony is consistent with the DOT in his opinion, there is no

23  record of the ALJ inquiring about consistency at the hearing.  AR 27.

24       Despite the ALJ's unsupported statement to the contrary, a conflict did exist between

25  Plaintiff's ability to frequently reach, handle, feel, grasp and finger, and the DOT's requirement

26  of the "constant" ability to move objects for the hand packager and machine packager positions.

27  DOT 920.587-018, 920.685-078.  "Frequent" is defined by SSR 83-10 as occurring from "one-

28  third to two-thirds of the time."  In contrast, "constant" is defined by the DOT as occurring "two-

thirds or more of the time."  DOT, Appendix C.  The DOT therefore requires more than frequent reaching, handling, feeling, grasping and fingering, which are all likely involved to some extent in "moving objects."

Although Defendant contends that the positions were consistent with Plaintiff's RFC because the DOT defines them as medium positions, Defendant fails to recognize that the definition of medium work includes the ability to perform "constant" movements that may be beyond Plaintiff's abilities.  While Plaintiff may indeed be able to perform a substantial number of these positions, the Court is unable to make this determination because the ALJ failed to ask the VE to explain the conflict.  Therefore, with respect to the hand packager and machine packager positions, the VE failed to provide sufficient support for his departure from the DOT and the error cannot be considered harmless.  _Massachi_, 486 F.3d at 1154, n. 19.

Plaintiff next argues that the VE erred in citing only to the Census Code for the extractor operator position because the Census Code groups together both skilled and unskilled jobs at all exertional levels in arriving at the number of positions available.[3]  Plaintiff further contends that had the VE identified the position by DOT code, he could not have performed any of the identified positions.

While there is no requirement in the SSRs that the ALJ set forth specific DOT job numbers, the requirement that the ALJ determine consistency with the DOT suggests that a DOT example is necessary.  The DOT lists eight types of extractor operator.  Of those, one is at the heavy level (551.685-054) and four are at the medium level (581.685-038, 581.685-058, 551.685-062, and 581.685-042).  Plaintiff cannot perform these positions, as the heavy position requires more than his RFC provides for and the medium positions suffer from the same deficiency as the hand packager and machine packager positions.  Again, there was no explanation for any deviation.

---

[3] The Census Code does not contain any vocational requirements.  Insofar as Defendant contends that Plaintiff has not provided support for his contention that the Census Code makes no distinction between skill levels, an examination of the actual listings confirms Plaintiff's argument.

Two of the remaining positions require a skill level above that of Plaintiff, who had no past relevant work experience and was therefore limited to unskilled work (521.685-118 and 552.682.018).  DOT, Appendix C; 20 C.F.R. §§ 404.1568 and 416.965.

The last position is listed as unskilled, light work (589.685-098).  Although generally a claimant who can perform medium work can also perform light and sedentary work, the ALJ could not rely on this listing without gathering additional information.  First, the examples identified were based on a medium, unskilled RFC, at the request of the ALJ.  AR 355.  The VE did not identify any sedentary or light positions, leaving the Court unable to evaluate such exertional levels.  See SSR 83-14 (ALJ must give citations of examples of occupations/jobs the person can do functionally and vocationally).

Second, the VE indicated that the Grids would apply at all exertional levels.  AR 355.  As a worker of advanced age, with a high school education that does not allow for entry into skilled work and no prior work experience, Plaintiff would be disabled at both the sedentary and light level.  20 C.F.R. § 404, Subpart P, App. 2, Rules 201.04 and 202.04.  Therefore, if Plaintiff could only perform the unskilled, light extractor operator position, he would be found disabled under the Grids.

Defendant makes two arguments that are worthy of discussion.  He first contends that Plaintiff cannot now complain about the VE's testimony because "he has presented no challenge to the qualifications of the VE or any other reason to doubt the VE's identification of jobs existing within the framework of the ALJ's specified limitations."  He further states, "[t]he VE had almost 30 years of experience in his field, and his credentials on the date of the hearing were current, as confirmed by the ALJ."  Opposition, at 15.  The VE's experience and credentials, or the lack of any challenge thereto, are not in any way relevant to this Court's review.  Whether the VE has one week or 30 years of experience, the Court's standard of review in determining whether the testimony was properly supported remains the same.

Defendant also argues that "since the ALJ asked the VE to take into consideration specific vocational factors such as age, education and work history, the ALJ essentially asked the VE to depart from the DOT."  Therefore, according to Defendant, "any potential conflict with the

DOT was resolved when the VE explained the source of his occupational evidence."  Opposition, at 16.  It is somewhat surprising that Defendant would make such a specious argument.  Indeed, if an ALJ automatically departed from the DOT by simply including age, education and work history in the hypothetical, then *all* VE testimony would immediately conflict with the DOT. Likewise, Defendant's contention that the VE only had to explain the source of his occupational evidence to explain a conflict ignores relevant law.  It is not the *source* of the VE's testimony that explains *a conflict,* but rather the VE's explanation of why Plaintiff's RFC allows for the performance of a position characterized by the DOT as requiring greater functional abilities.

The ALJ's reliance on the VE at step five was therefore not supported by substantial evidence and was not free of legal error.  Remand will be discussed at the end of this order.

C.    Analysis of Plaintiff's Obesity

Plaintiff next argues that the ALJ failed to comply with SSR 02-1p when evaluating the impact of his obesity.

Pursuant to SSR 02-1p, obesity must be considered throughout the sequential evaluation process, including when determining an individual's RFC.  "The combined effects of obesity with other impairments may be greater than might be expected without obesity."  SSR 02-1p. The Ninth Circuit recently held that pursuant to SSR 02-1p, the ALJ must consider obesity in determining RFC based on the information in the case record.  *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  In *Burch*, the ALJ did not find that the claimant's obesity, in combination with her other impairments, met a Listing.  *Burch*, 400 F.3f at 682-683.  The court held that this was not reversible error, as it is the claimant's burden to prove that she has an impairment that meets or equals the criteria of an impairment in the Listings.  *Id.* at 683.  An "ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."  *Id.*

Here, the ALJ found that Plaintiff's obesity was a severe impairment.  He notes that Plaintiff "consistently ranged from 289 pounds to 308 pounds."  AR 23.  Elsewhere, he noted that Plaintiff was 5 feet, 11 3/4 inches tall.  AR 24.  Citing 02-1p and stating that he has

considered the combined effects of all the impairments, including Plaintiff's obesity, the ALJ

determined that his "obesity does significantly impact his minimal degenerative disc disease, but

not to the extent that [it] is disabling."  AR 23.

Plaintiff believes that this conclusion was made "without further discussion" of the

impact of his  obesity on his overall functioning.  Opening Brief, at 13.  Throughout the decision,

however, the ALJ noted Plaintiff's obesity when relevant.  For example, in April 2007, Plaintiff

weighed 289 pounds.  Dr. Bhangoo noted that he walked into the examination room without any

difficulty, and was able to get in and out of the chair, and on and off the examination table

without difficulty.  His station was normal and gait was not antalgic.  Plaintiff was able to tip-toe

and heel walk.  AR 24.

Contrary to Plaintiff's description, there simply was no evidence in the record that his

obesity caused any resulting limitations or contributed to his symptom in ways beyond those

found by the ALJ.  Although the record contained documentation of Plaintiff's obesity, he does

not point to any resulting limitations.  The mere diagnosis of an impairment is not sufficient to

sustain a finding of disability.  _Key v. Heckler_, 754 F.2d 1545, 1549 (9th Cir. 1985).

As part of his argument, Plaintiff calculates his Body Mass Index and notes that it puts

him in the "extreme" obesity classification.  Plaintiff also cites a February 2002 notation from his

treating physician that states, "will refer him to gastric bypass surgeon for obesity.  Diet and

exercise have failed."  AR 198.  Again, however, the mere fact that Plaintiff is obese does not

automatically translate into related limitations.[4]

Finally, Plaintiff contends that the ALJ's characterization of his degenerative disc disease

as "minimal" ignores the results of the findings of the September 2004 MRI.  Whatever the

results of the MRI, the opinion evidence nonetheless demonstrates that the resulting limitations

were relatively mild.  AR 160-164, 169-173, 270-277.  Additionally, although Dr. Qureshi was

aware of the MRI results, he did not note _any_ objective findings related to Plaintiff's back during

his many examinations.

[4] Plaintiff's argument that the ALJ improperly relied on his failure to lose weight in his credibility analysis
will be discussed in the appropriate section of this opinion.

The analysis of Plaintiff's obesity was therefore supported by substantial evidence and free of legal error.

D.      Compliance with SSR 96-6p

Next, Plaintiff argues that the ALJ failed to comply with SSR 96-6p by not explaining the weight afforded to the opinion of State Agency physician Yates.  However, Plaintiff does not provide any argument or evidence as to why the ALJ should have adopted Dr. Yates' opinion over that of Dr. Bhangoo.  Instead, Plaintiff's argument is focused mainly on why he would have been found disabled had the ALJ adopted Dr. Yates' limitations related to climbing, stooping, kneeling, crouching and crawling.  Although Plaintiff tries to characterize the issue differently, the ALJ's treatment of Dr. Yates' opinion must be examined in the context of his treatment of the other medical opinions.[5]

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.  _Winans v. Bowen_, 853 F.2d 643, 647 (9th Cir.1987).  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  _Baxter v. Sullivan_, 923 F.2d 1391, 1396 (9th Cir.1991).  Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.  _Murray v. Heckler_, 722 F.2d 499, 502 (9th Cir.1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician.  _Pitzer v. Sullivan_, 908 F.2d 502, 506 (9th Cir.1990);

---

[5] Plaintiff's citation to SSR 96-6p does not alter this result.  SSR 96-6p simply explains that the opinion of a State Agency physician must be treated as expert opinion evidence and may not be ignored.  It further provides that the ALJ must explain the weight given to these decisions in their opinions.  While this is an accurate policy interpretation, this Court must examine the issue pursuant to the _case law_ relating to the weight afforded to opinion evidence.

_Gallant v. Heckler_, 753 F.2d 1450 (9th Cir.1984).  As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.  _Pitzer_, 908 F.2d at 506.  And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  _Andrews v. Shalala_, 53 F.3d 1035, 1043 (9th Cir.1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.  _Pitzer_, 908 F.2d at 506 n. 4; _Gallant_, 753 F.2d at 1456.  In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor.  _E.g., Magallanes v. Bowen,_ 881 F.2d 747, 751-55 (9th Cir.1989); _Andrews_, 53 F.3d at 1043; _Roberts v. Shalala_, 66 F.3d 179 (9th Cir.1995).  For example, in _Magallanes_, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians...."  _Magallanes_, 881 F.2d at 752 (emphasis in original).  Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion.  _Id._ at 751-52.

Here, the record contained the opinions of Dr. Bhangoo, a consultive examiner, and State Agency physicians Yates and Glaser.  All are substantially similar, though Dr. Yates determined that Plaintiff could only occasionally, rather than frequently, climb, stoop, kneel, crouch and crawl.  After examining the medical evidence, the ALJ found that Dr. Bhangoo's opinion should be given the greatest weight "as an examining source and because his opinion is consistent with the rest of the medical evidence discussed in this section."  AR 26.  As the ALJ explained, Dr. Bhangoo examined Plaintiff in April 2007, and noted that Plaintiff walked and got on and off the examination table without difficulty.  His station was normal, his gait was not antalgic, and he was able to tip-toe and heel walk.  Finger-to-nose test and heel-to-knee test were normal and Romberg was absent.  Straight leg raising was negative bilaterally.  There was no paravertebral

muscle spasms, tenderness, crepitus or effusions noted.  Motor strength was 5/5 with good muscle bulk and tone.  AR 24.

As there was no opinion from a treating source, Dr. Bhangoo's opinion was entitled to the greatest weight.  Indeed, a consultive examiner's opinion may constitute substantial evidence where, as here, it is based on the examiner's independent findings and observations.  *Tonapetyan v. Haler*, 242 F.3d 1144, 1149 (9th Cir. 2001).

In contrast, the opinions of State Agency physicians Yates and Glaser were entitled to the least weight.  The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.  *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456.  Plaintiff contends that Dr. Bhangoo was "merely" a consultive examiner in suggesting that Dr. Yates' opinion was superior, yet his argument is contrary to well established case law.

The ALJ reviewed Dr. Yates' and Dr. Glaser's opinion and correctly noted that except for Dr. Yates' postural limitations, all opinions placed Plaintiff at the medium exertional level.  AR 26.  Contrary to Plaintiff's contention, he did not ignore either opinion.  From his statements adopting Dr. Bhangoo's opinion, one can infer that the ALJ found his opinion to be more in line with the medical evidence.  *Magallanes*, 881 F.2d at 755 (The ALJ need not recite the incantation "I reject the treating physician's opinions because ..." so long as the record reveals specific, legitimate inferences that may be drawn from the ALJ's opinion justifying the decision not to adopt the treating physician's opinion.).  In fact, Dr. Glaser's opinion was less limiting than Dr. Bhangoo's opinion and the ALJ therefore adopted the middle ground in determining Plaintiff's RFC.

Elsewhere in his brief, Plaintiff suggests that Dr. Bhangoo's opinion was incomplete because he did not review the September 2004 MRI.  His review of the MRI, however, would not have changed the results of his objective testing and observations of Plaintiff during the examination.  Moreover, as previously explained, Dr. Qureshi was aware of the MRI results yet never noted *any* objective findings as to Plaintiff's back.

The courts do not have the responsibility for weighing the evidence and resolving conflicts therein, that responsibility belongs to the Commissioner alone. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). The Court must uphold the ALJ's decision where, as here, the evidence is susceptible to more than one rational interpretation. *Magallanes,* 881 F.2d at 750.

The ALJ's review of the medical evidence is supported by substantial evidence and is free of legal error.

E.    Analysis of Plaintiff's Credibility

Plaintiff next argues that the ALJ improperly rejected his allegations regarding the severity of his impairment.

In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*

> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

1.    *Past Work History*

In assessing Plaintiff's credibility, the ALJ first explained that Plaintiff had a "dismal work history," with no substantial gainful activity in the past 15 years and only 15 full substantial gainful activity years in his life.  AR 25.  Plaintiff does not dispute the ALJ's ability to examine

his work history, but contends that the ALJ failed to explore the reasons behind his prior employment record.  Plaintiff points to his testimony that his doctor advised against spinal surgery and that his doctor considered him disabled.  AR 352.  These comments were not made, however, in the context of explaining why he had not sought work since 1990.  Moreover, although Plaintiff was 58 years old, he does not dispute that he had only 15 years of substantial gainful activity.  Finally, Plaintiff had not worked since 1988, *before* the alleged onset date.  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (claimant's "extremely poor work history" and demonstrated lack of "propensity to work in her lifetime" constituted clear and convincing reasons for discounting claimant's credibility).

    2.    *Demeanor at Hearing*

    The ALJ next noted that Plaintiff's demeanor at the hearing was "frequently evasive and non-responsive."  AR 25.  Plaintiff argues that this was not a fair characterization of his testimony because he responded to every question asked.  Plaintiff also points to the fact that he was not represented at the hearing.  The Court agrees that it is a stretch to characterize his demeanor as evasive and non-responsive, especially in light of the fact that he did not have an attorney present and likely did not have the benefit of preparation by an attorney before hearing. While there were instances during questioning that Plaintiff had a difficult time responding, it does not appear that he did so for any reason other than having difficulties quantifying his abilities.  AR 339, 340, 346-347.  This statement was therefore not supported by substantial evidence and the impact of the error will be discussed at the end of the credibility review.

    3.    *Daily Activities*

    Next, the ALJ turned to Plaintiff's daily activities and found that he had a significant range of daily activities.  He explained,

> For example, Plaintiff drives two to three times a week, takes care of his personal needs, cooks twice a day, takes out the trash and does laundry once a week, takes care of his animals, shops once per month, visits on the phone once a day, visits with family and friends two times a month, reads for two hours a day, watches television for six hours a day, and uses the computer everyday for about two hours.

AR 25.

These activities, however, are relatively sedentary activities.  To cite daily activities in an adverse credibility finding, a claimant must be able to spend "a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." _Orn v. Astrue_, 495 F.3d 625, 639 (9th Cir. 2007).  To the extent the ALJ cites Plaintiff's "physical" activities, such as cooking, taking out the trash or doing laundry, those activities are not performed frequently enough to support a finding that Plaintiff spends a "substantial" portion of his day performing such activities.  Insofar as the ALJ cites talking on the phone, reading, watching television and using the computer, such activities bear no relationship to the activities of the workplace.  _Orn_, 495 F.3d at 639 ("reading, watching television, and coloring in coloring books are activities that are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace.").

The ALJ also cites Plaintiff's July 2006 Function Report, where Plaintiff reported that he "prepared simple meals, watched television, did laundry once a week, went to the post office once a day to get the mail, drove, shopped once a month, and visited with others via the computer." AR 25.  These activities, too, while slightly more physical than those cited above, do not satisfy the requirements set forth in _Orn._

The ALJ also cites Plaintiff's Function Report in explaining that although he reported that lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing were affected by his impairments, he did not quantify any limitations or explain how those areas are affected.  AR 25.  The ALJ acknowledged that Plaintiff explained that he could only walk 100 feet before needing to rest, but found that this was contrary to the medical evidence and Plaintiff's own testimony.  AR 25.  The ALJ's characterization, however, is not fully accurate.  First, Plaintiff checked the boxes to indicate that the above activities were affected by his impairments, and explained in the space below that "back and leg pain limits activity to perhaps 10 or 15 minutes, shopping for groceries for 1/2 hour will take all the following day to recovery." AR 141.  While this may not have been the most descriptive explanation, it doesn't equate to a total failure to explain, as they ALJ suggests.

Second, Plaintiff's own testimony that he could walk for "perhaps a half block" does not necessarily contradict his July 2006 report that he could walk 100 feet.  AR 348.  As these are Plaintiff's estimates, "100 feet" and "perhaps a half block" are not sufficiently contradictory to question Plaintiff's credibility.

The ALJ's reliance on Plaintiff's daily activities, then, is not supported by substantial evidence and is not free of legal error.  The impact of the error will be discussed below.

4.     *Treatment*

The ALJ next explained that Plaintiff was less than compliant with his treatment, despite his testimony to the contrary.  For example, Plaintiff first stated that he was fully compliant with his treatment, but then stated that he was only 65 percent diet compliant.  AR 26, 345-346.  The ALJ also noted that there were numerous notations in the record where Plaintiff failed to regularly check his blood sugars and failed to take his prescribed medications.  AR 26.  Finally, the ALJ contrasted Plaintiff's testimony that he was told to cut down on saturated fats, but was not told to exercise or lose weight, with the record.  Plaintiff's treating physician repeatedly gave him diet and exercise instructions over a period of years, and noted numerous times that Plaintiff was not compliant with his treatment.[6]  *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (claimant's failure to seek or follow prescribed treatment is a proper basis for finding her allegations of disabling pain and other symptoms not credible).

5.     *Medical Record*

Finally, the ALJ explained that the medical record did not fully support Plaintiff's allegations.  For example, on numerous occasions, Plaintiff's treating physician indicated that he would refer Plaintiff to certain specialists and instructed Plaintiff to follow up.  There are no records that Plaintiff actually did so, however.  AR 26.

Insofar as Plaintiff suggests that the ALJ should have inquired about referrals at the hearing or requested the medical records from these possible sources, the records support a

---

[6] Plaintiff argues that SSR 02-1p prohibits the ALJ from questioning a claimant's credibility based on his failure to lose weight.  The ALJ here, however, cited Plaintiff's failure to regularly check his blood sugars and take his prescribed medication in finding him not compliant with treatment.  The ALJ only used the notations of diet and exercise to contradict Plaintiff's own testimony that he was not given such instructions.

conclusion that Plaintiff did not seek treatment from the referral sources. Dr. Qureshi first referred Plaintiff to a neurosurgeon in December 2004. AR 184. He referred Plaintiff to a neurologist in July 2005. At no time did Dr. Qureshi indicate that Plaintiff sought further treatment, nor did he receive any records from referral sources. In December 2005, Plaintiff was "strongly urged" to make appointments with numerous specialists, including a foot doctor, eye doctor, dentist and diabetic educator. Plaintiff told Dr. Qureshi that he would make his own appointments. AR 182. He was again "strongly urged" to make these appointments in October 2006, but there is no indication during the remainder of treatment with Dr. Qureshi that Plaintiff did so. AR 177. This, combined with the repeated notations that Plaintiff was not compliant, suggest that Plaintiff did not make any appointments with the referral sources.[7]

The ALJ also noted that the office notes indicate that Plaintiff's condition was generally "unchanged" or "unremarkable." AR 26. Indeed, during the first visit, Plaintiff's examination was unremarkable. AR 193. Despite his complaints of back pain, his examinations continued to be either unchanged or unremarkable and Dr. Qureshi never made any objective findings relating to Plaintiff's back. Dr. Qureshi also noted that Ultram was "somewhat effective." AR 179. The ALJ may use "ordinary techniques" in addressing credibility. _Light v. Soc. Sec. Admin._, 119 F.3d 789, 792 (9th Cir. 1997), and may make inferences "logically flowing from the evidence." _Macri v. Chater_, 93 F.3d 540, 544 (9th Cir. 1996).

Plaintiff objects to the ALJ's citation to the numerous unchanged or unremarkable examinations, arguing that they are irrelevant because Plaintiff's treating physician advised him that he is disabled. Not only would Dr. Qureshi's notes not support such a finding, but a treating physician's opinion that a claimant is disabled is not controlling. A treating source's opinion is not conclusive as to a physical condition or the ultimate issue of disability. _Magallanes_, 881 F.2d at 751.

---

[7] Moreover, at the beginning of the hearing, when the ALJ asked Plaintiff if he "ha[d] all the documents" Plaintiff wanted the ALJ to see, Plaintiff responded, "Yes, Your Honor." AR 328.

6.      *Harmless Error*

Based on the above review, two out of the five reasons given to discredit Plaintiff's allegations were not supported by substantial evidence.  However, the Court finds the error harmless and will uphold the credibility analysis in light of the lack of supporting medical evidence.  *Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one reason may have been in error).

F.      Plaintiff's Waiver of Counsel

Plaintiff, who represented himself at the hearing, now argues that his waiver of counsel was invalid and that he was greatly prejudiced as a result.

When a claimant appears at a hearing without counsel, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.  He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir.1985) (quoting *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir.1978)).  Although a plaintiff has the right to be represented by counsel at an administrative hearing before an ALJ, the "[l]ack of counsel does not affect the validity of the hearing unless the plaintiff can demonstrate prejudice or unfairness in the administrative proceedings."  *Key*, 754 F.2d at 1551 (citing *Vidal v. Harris*, 637 F.2d 710, 713 (9th Cir.1981)).

In arguing that his waiver was invalid, Plaintiff cites HALLEX I-2-6-52, but he does not explain how the waiver was allegedly invalid.[8]  This section addresses the ALJ's opening statement and requires that the ALJ ensure that an unrepresented claimant is capable of making an informed choice about representation.  For example, the ALJ should ask whether the claimant received the hearing acknowledgment letter and enclosures and whether the claimant understood the information contained therein.  "Once the ALJ has determined that Plaintiff is capable of making an informed choice, he or she will secure, on the record, the claimant's decision concerning representation."

---

[8] HALLEX does not have the force and effect of law and is not binding on the Commissioner.  *Moore v. Apfel*, 216 F.3d 864 869 (9th Cir. 2000).  The Court will, however, examine the argument.

At the beginning of the hearing, the following conversation occurred:

ALJ:         Sir, I see you're here today without a lawyer or other qualified representative.  I know we sent you notice in the mail explaining your rights to representation.  I assume you got that notice because you're here today.  Did you understand your rights to representation, sir?

Plaintiff:   Yes, Your Honor.  I did.

ALJ:         Do you wish to give up those rights and go forward with your hearing today without a representative?

Plaintiff:   Yes, Your Honor.  I do.

AR 327.

Although the adequacy of the waiver does not impact whether prejudice or unfairness existed, the Court notes that the ALJ complied with HALLEX and Plaintiff provides no argument as to why he believes that this was not an informed choice.  The Court further notes that throughout the administrative appeal, Plaintiff received five notices that informed him of his right to counsel.  AR 47-51, 52, 53-57, 60-64, 62-63, 65-70.  In the first Notice of Hearing, Plaintiff was informed of his right to counsel and was further informed that a VE would be present at the hearing.  AR 67.  The second Notice of Hearing again informed Plaintiff of his right to counsel.  AR 79-82.  Plaintiff returned a signed Acknowledgment of the Notice on May 1, 2008.  AR 96.

Moreover, Plaintiff was aware that during his first hearing in 2003, he exercised his right to representation by appearing with an attorney.  AR 280-324.

Accordingly, there is no indication that Plaintiff's waiver was anything other than knowing and intelligent.  See eg. _Polk v. Astrue_, 2010 WL 148203, *2 (C.D. Cal. 2010) (Court's review of the hearing transcript and four notices advising plaintiff of his right to counsel shows that plaintiff's waiver was valid).

G.      Prejudice

As discussed above, even where the waiver was valid, the Court must examine whether the ALJ "scrupulously and conscientiously" explored all relevant facts.  _Cox_, 587 F.2d at 991.  In this regard, Plaintiff contends that he was prejudiced by the ALJ's inadequate examination of the VE and by the ALJ's failure to further develop the record.

### 1.    *Examination of VE*

The Court has already determined that the VE's testimony was not supported by substantial evidence and it would therefore be hard-pressed to find that Plaintiff was not prejudiced by the ALJ's inadequate examination of the VE.  Had Plaintiff been represented by counsel at the hearing, counsel likely would have questioned the VE as to whether the identified positions were consistent with the DOT.  See eg., *Vidal v. Harris*, 637 F.2d 710, 713 (9th Cir. 1981).  The ALJ therefore failed to meet the burden set forth in *Cox* and Plaintiff was prejudiced as a result.

### 2.    *Development of Record*

Plaintiff contends that he was prejudiced by the ALJ's failure to request a medical source statement from his treating physician.

The ALJ has a duty to fully and fairly develop the record to assure that the claimant's interests are considered.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001) (holding that ALJs have a duty fully and fairly to develop the record only when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence).  This duty extends to the represented as well as to the unrepresented claimant.  *Id.*  When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts.  *Id.* (citing *Cox*, 587 F.2d at 991)).

Here, the evidence was neither inadequate nor ambiguous to trigger the ALJ's duty to request further records from Plaintiff's treating physician.  Although Dr. Qureshi's notes cite back pain, he made no objective findings.  The lack of objective findings suggests that Plaintiff would not have had limitations beyond those found by Dr. Bhangoo or the State Agency physicians.

The Court also disagrees with Plaintiff's reading of 20 C.F.R. § 416.913(b)(6), which he contends obligates an ALJ to request a medical source statement.  This section states, "Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete."  In the instant action, there was a medical source statement in evidence from the consultive examiner

1  and the Court has determined that the ALJ properly analyzed the medical evidence.  Section

2  416.913(b)(6) requires no further action by the ALJ.

3  H.    Remand

4        Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

5  power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

6  or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

7  In social security cases, the decision to remand to the Commissioner for further proceedings or

8  simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d

9  599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

10  administrative proceedings, a social security case should be remanded.  Where, however, a

11  rehearing would simply delay receipt of benefits, reversal and an award of benefits is

12  appropriate."  *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

13  F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

14  useful purpose would be served by further administrative proceedings, or where the record has

15  been thoroughly developed.").

16        Here, the Court has determined that the ALJ's step five finding was not supported by

17  substantial evidence and free of legal error.  Moreover, because Plaintiff was unrepresented, he

18  was prejudiced by the ALJ's failure to ask the VE whether the identified positions were

19  consistent with the DOT.

20        These errors, however, can be remedied with further proceedings.  Accordingly, the

21  decision is REVERSED and the action is REMANDED for additional proceedings.  On remand,

22  the ALJ must ensure that a step five finding, if any, is supported by substantial evidence and free

23  of legal error.  If Plaintiff remains unrepresented, the ALJ must also conduct the proper inquiry

24  and exploration of all relevant facts.  See *Vidal*, 637 F.2d at 714-715 ("interests of justice

25  demand that the case be remanded.")

26        IT IS SO ORDERED.

27  Dated:    **June 8, 2010**            **/s/ Dennis L. Beck**
                                       UNITED STATES MAGISTRATE JUDGE

28